IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

CHAD and TONYA RICHARDSON, Individually and as                    PLAINTIFFS
Parents and Next Friends of L.

V.                          CASE NO. 3:19-CV-03080

OMAHA SCHOOL DISTRICT                                              DEFENDANT

<u>MEMORANDUM OPINION AND ORDER</u>

At the Court's direction,[1] plaintiffs Chad and Tonya Richardson have filed a Motion in Support of Count I of their Complaint and a Memorandum Brief in Support (Docs. 19 & 20). They appeal the decision of an Arkansas Department of Education ("ADE") Hearing Officer, and they ask the Court to find by a preponderance of the evidence that Defendant Omaha School District (the "District") violated their child's ("L.") rights under the Individuals with Disabilities Education Act ("IDEA") during Spring 2017 and the 2017–2018 and 2018–2019 school years. The District filed a Response and Plaintiffs replied (Docs. 27 & 32). The entire administrative record has been filed and reviewed by the Court, and the matter is ripe for disposition.

## I.  BACKGROUND

L. is currently a 10th grade student at the District who was diagnosed with autism in elementary school, and he has subsequently been diagnosed with ADHD, Tourette's

---

[1] The Richardsons' Complaint (Doc. 2) alleges three claims, the first of which is an appeal from the Hearing Officer's decision on their IDEA claim. At the February 12, 2020, Rule 16 Case Management Hearing, the Court issued an Order (Doc. 16) bifurcating the issues to be resolved in the case and directing Plaintiffs to file a brief in support of their arguments on Count I, which is the subject of this Memorandum Opinion and Order.

syndrome, and post-traumatic stress syndrome.   Under the IDEA, the District must provide L. with a free appropriate public education ("FAPE"), 20 U.S.C. § 1412(a)(1), which includes special education and related services in conformity with an individualized education program ("IEP"), *id.* at § 1401(9)(D).   The IDEA sets out a process by which teachers, school officials, and a child's parents should collaborate to draft an IEP that fits the child's unique needs.  *See id.* at § 1414(d)(1)(B).

When a parent disagrees with other members of the IEP team over what the IEP should include, the parties may attempt to resolve the disagreement, either through a "preliminary meeting" or through mediation.  *Id.* at §§ 1415(e), (f)(1)(B)(i).  If unsuccessful, then the parent may file a complaint with the Arkansas Department of Education to initiate a "due process hearing."   *See id.* at § 1415(f)(1)(A).   Following the Hearing Officer's decision, the losing party may appeal it by filing a lawsuit in federal court.   *See id.* at § 1415(i)(2)(A).   And that is what happened here.   This case is the latest in a series of lawsuits between the Richardsons, on behalf of their disabled child, L., and the District, where L. is enrolled as a student.

During Fall 2016—L.'s 6th grade year—L. suffered an episode while at school that led his parents to decide to educate him at home.   The Richardsons alleged that L.'s episode—which included increased tics, later ascribed to L.'s Tourette's syndrome—was caused by bullying by L.'s peers and teachers.  On November 29, 2016, the Richardsons filed a due-process complaint alleging L. was denied a FAPE, and while the Hearing Officer rejected the Richardsons' claims related to bullying, the Hearing Officer did find that the District denied L. a free, appropriate public education ("FAPE") because it failed to reevaluate L. and failed to provide IEPs reasonably calculated to enable L. to make

progress appropriate in light of his specific circumstances.  The Hearing Officer ordered the District to evaluate L. within 30 days to determine his academic, social, and behavioral deficits and then update L.'s IEP accordingly.  The Richardsons then appealed to this Court, seeking attorneys' fees and bringing new claims under Section 504 and the ADA. The issues raised in that appeal were ultimately resolved in the District's favor, and the Eighth Circuit affirmed this Court's rulings in that matter.  *See Richardson v. Omaha Sch. Dist.*, 957 F.3d 868, 872 (8th Cir. 2020) ("*Richardson I*").

This case picks up where the first due-process complaint left off.  In Fall 2016, L.'s placement was changed to full-time special education, but the Richardsons chose to educate L. at home for the remainder of the 2016–2017 school year.  During Spring 2017, the District sent homework to L., but no in-home services were provided to him until May 2017, at which point Jennifer Robinson began to provide him with homebound instruction, at the District's cost.  It is undisputed that L. did not take standardized tests during Spring 2017.  Then, as a result of the Hearing Officer's decision in *Richardson I*, the District paid for Dr. Charles Nichols to conduct a comprehensive evaluation of L., although he did not evaluate L. for emotional disturbances, at the direction of the Richardsons.

Following the Hearing Officer's decision in *Richardson I*, the District and the parents collaborated to generate a new IEP for L.  In May 2017, the IEP committee created an IEP which stated that L.'s autism "has an adverse [e]ffect on his involvement and progress in the general education," and it notes that he "is functioning below grade level in the areas of math, basic reading, reading comprehension, written expression, and adaptive behavior . . . ." (Doc. 17-3, p. 185).  The IEP memorialized that L.'s "most recent STAR assessment show[s] his reading to be a grade of 2.3 and his math level to be 3.1 .

. . ."  *Id.* at p. 185.  Additionally, it was agreed that the District would provide L. with 90 hours of compensatory education and that L. would also receive 28 hours of occupational therapy compensatory education.  The May 2017 IEP notes that "[s]ervices will be provided as long as [L.] can tolerate instruction per guidance of medical doctor and parent input.  [Extended school year] is not needed in light of [L.]'s anxieties and tolerance at the present time."  (Doc. 17-3, p. 187).  Another note clarified that the above hours were "proposed by the district" and would be "provided to student as he can tolerate . . . ."  *Id.* at p. 191.

Following Dr. Nichols' evaluation, L.'s IEP was revised in July 2017.  Dr. Nichols found that L. had "severe disparities in reading fluency, math calculations, math reasoning, and spelling," and he also found that L. had an IQ score of 84 (Doc. 17-4, p. 27).  The revised IEP repeated that the District would provide services to L. to the extent L. could tolerate instruction, but it added that "[p]arents and staff will work on increasing exposure to campus to assist with future transition."  *Id.* at p. 28.  Going forward, the IEP stated that the District would offer L. five educational hours per week, 30 hours of occupational therapy a per week, 30 minutes of speech therapy a week, and one hour of cognitive behavioral therapy per week, all in the homebound setting.  *Id.* at p. 31.  Furthermore, consistent with the May 2017 iteration of the IEP, Ms. Robinson provided L. with homebound compensatory education during the summer months of 2017.  L.'s seventh grade year started in August 2017, and he continued to receive homebound instruction from Ms. Robinson (Doc. 18-1, p. 232).

Consistent with the operative IEP, L. began to see psychologist Dr. Ann Colvin in July 2017.  Her notes from July 27, 2017, state that the plan was to provide L. with one

hour of instruction per day during the summer and that she was "in agreement with a slow process." (Doc. 17-4, p. 49). In October, the IEP committee met to discuss transitioning L. back into the classroom and to increase his speech and occupational therapy, but the committee concluded that those changes would not be successful at that time (Doc. 17-4, p. 67). A letter from Dr. Colvin dated November 13, 2017, states that "we determined to slow down the pace to [sic] reintegrating him into a traditional school environment." (Doc. 17-4, p. 103). She noted that she referred him to Jennifer Savage for eye movement desensitization and reprocessing ("EMDR") and that he had seen "positive progress" with this treatment. *Id.* Medical notes from L.'s meetings with Ms. Savage in November 2017 indicate that L.'s tics had increased but that he expressed a desire to return to school (Doc. 17-4, pp. 83–84).

Dr. Colvin agreed that L. should be reintegrated into the school environment, and she met with Mr. Richardson to plan for L.'s to return to school. *Id.* at p. 93. Dr. Colvin's recommended plan was to ease L. back into the classroom environment by exposing him to the school campus after hours, giving him assignments that more closely resembled school work, and helping Ms. Robinson in her on-campus classroom. *Id.* Dr. Colvin's notes from November 27, 2017, state that she and Ms. Savage agreed that reintegration was a "much needed step of [L.'s] treatment plan." *Id.* at p. 121. On December 22, 2017, Dr. Colvin wrote a letter requesting that L.'s homebound services be continued until June 6, 2018, but also "recommend[ing] efforts to begin to re-enter [L.] into the school environment." *Id.* at p. 131.

On March 27, 2018, the IEP committee met to discuss L.'s progress and review the need for further homebound services. The notes from that meeting state that L. had

mastered "2 out of 4 objectives" relating to his social communication skills, mastery of one occupational therapy goal, and ongoing progress towards three other occupational therapy goals (Doc. 17-5, p. 58).  The notes also state that L. made "progress on all academic goals" and on "adaptive behavior goals."  *Id.*  Ms. Robinson and Mr. Richardson agreed that L. showed "more independence in the last quarter."  *Id.*  The committee agreed that homebound services were still needed, but they also recommended that L. come to the school after hours to reintegrate.  *Id.*

Dr. Colvin met with L. and Mr. Richardson on April 16, 2018.  She was concerned that L. was "not progressing towards being in school."  (Doc. 17-5, p. 73).  She also reported that Mr. Richardson said Ms. Robinson's home instruction attendance was "variable" and that L. was being given fractions assignments that were too advanced.  *Id.*  At an April 25, 2018 appointment, Dr. Colvin discussed with Mr. Richardson "the absolute need for structure and routine [for L.], particularly school and peers."  *Id.* at p. 75.  The next day, April 26, 2018, Dr. Colvin authored a letter in which she requested that L. receive homebound services during the summer of 2018, but she emphasized that

> [L.] needs to continue to work to re-enter school and a standard day.  He needs a consistent and predictable schedule for school, occupational and speech therapy services.  He will need to work towards being on campus and prepare to a return to school full days.  It is not i[n] his best interest to continue to remain on homebound services indefinitely and I only recommend he receive services over the summer as he is likely quite behind.

*Id.* at p. 93.  Dr. Colvin met L. and his father again on April 30, 2018, and her notes stated that L. "very much wants to return to school," and Dr. Colvin again noted that she was "concerned that [L.] needs to be in a structured routine."  (Doc. 17-5, p. 101).

Then, after speaking with Ms. Robinson, Dr. Colvin drafted another letter on May 3, 2018, in which she suggested which accommodations should be made to reintegrate L. into the classroom, and she concluded that "it is now time to work [L.] towards being with peers." *Id.* at p. 116. Accordingly, on May 8, 2018, the IEP team amended L.'s IEP to include a shortened school day of two periods per day, and the amended IEP incorporated Dr. Colvin's recommended accommodations. *Id.* at p. 112. The District also offered to provide a bus aide to accompany L. to and from the school campus. *Id.* at p. 136.

Ultimately, in May 2018, an attempt was made to reintegrate L. into the classroom environment. L. spent four days on campus during normal school hours. On the first of these days, May 10, 2018, L. went to class and socialized with peers. The paraprofessional who accompanied L. noted "some level of increased leg movement" but also observed that L. "felt good about being with peers." (Doc. 17-5, p. 145). The second day, May 11, L. went to school for approximately one hour, visited peers, but did not perform any work. *Id.* The third day, May 14, L. went to school but became stressed and exhibited tics after performing math work, so he took a walk to calm down. *Id.* Finally, L. went to school on May 18 where he engaged with his peers and stayed for about an hour. In all, L. spent approximately 200 minutes in school during these four days in May 2018. The paraprofessional's notes concluded that overall L.'s reintegration attempt was "going well" and that "when engaged in work he starts to become agitated." *Id.* at p. 146. L. reported to Dr. Colvin that he rated his experience in the classroom as a "C." *Id.* at p. 171.

On May 22, 2018, the IEP committee again met to discuss the plan for L.'s upcoming school year.  Ms. Robinson stated that L. had made progress during the last year, and she stated that extended year services were not needed because L. had not regressed.  *Id.* at p. 162.  The committee did, however, believe that L. remained entitled to 29 hours of occupational therapy and 59 hours of education as compensatory education.  *Id.*  Accordingly, Ms. Robinson provided L. with his compensatory education during the summer months of 2018 (Doc. 18-1, p. 235).

During Summer 2018, L. attended camp at Infinity Academy ("Infinity") in Springfield, Missouri.  L. reported to Dr. Colvin that he enjoyed his experience at Infinity, and staff at Infinity reported that he had no tics and that he fit into the environment.  L. rated his experience there as an "A."  *Id.* at p. 221.  At the parent's request, Infinity prepared an "Individual Service Plan" for L.  *Id.* at pp.215–217.  This three-page document described L.'s strengths and the services he received from the District.  The second page of the document describes the services that are offered to all students at Infinity, and the third page includes a rubric for assessing L.'s progress.  *Id.* at p. 216.  The document notes that "[L.] attended a week of camp at Infinity Academy; further discussion and observation will be necessary to truly obtain an accurate method of measuring success in our school environment."  *Id.* at p. 217.

The IEP committee met on June 27, 2018, to discuss the possibility of a private placement for L. at Infinity.  *Id.* at p. 227.  The District requested additional information regarding Infinity, including their curriculum, the services provided, their ability to meet L.'s IEP, and information regarding costs.  *Id.* at p. 228.  In response, Dr. Brenda Bradshaw, the executive director of Infinity, sent a letter to the Richardsons in which she

explained that Infinity is not accredited in Missouri, though their curriculum is offered through Acellus Academy, which is accredited in California.  *Id.* at pp. 232–233.  Dr. Bradshaw could not confirm that L. would be eligible to graduate in Arkansas if he completed their curriculum.  *Id.* at p. 233.  Additionally, Dr. Bradshaw stated that Infinity is not required to implement IEPs, and while they would be "delighted to collaborate" with the District to "align goals and objections," they declined to serve as the "manager or implementer" of an IEP created by the District.  *Id.*  Then, on July 17, 2018, members of the IEP team met with Dr. Bradshaw to attempt to find a resolution, but Dr. Bradshaw ultimately confirmed that Infinity would not implement the District's IEP.  *Id.* at p. 249.

On August 13, 2018, the IEP committee once again met to revise L.'s IEP for his upcoming 8th grade year.  Per the Richardsons' request, L.'s homebound hours were increased to ten per week.  *Id.* at p. 280.  Further, the new IEP provided L. with the following services each week:  One hour of speech therapy, one and a half hours of occupational therapy, one hour of cognitive behavioral therapy, and one hour of EMDR therapy.  *Id.* at p. 281.  Shortly following the creation of the new IEP, L. met with Dr. Colvin again, and she reported that L.'s writing had significantly improved.  *Id.* at p. 291.  She noted that the family was hesitant to return him to the classroom.  *Id.*

Ms. Jaro replaced Ms. Robinson as L.'s homebound instructor in September 2018.  She stated that when she began providing L. with homebound instruction, he could tolerate approximately 45 minutes to an hour each day (Doc. 18-4, p. 214).  L.'s IEP team again met on September 5, 2018, to discuss increasing L.'s homebound services as well as potential private placements (Doc. 17-5, p. 303).  The committee discussed increasing L.'s homebound instruction hours, but the Richardsons rejected that proposal because

the District could not provide such additional hours during the morning.  *Id.*  Dr. Colvin noted that L. required services during the day "when stress, calm and focus is best for [L.] . . . ."  *Id.* at p. 315.  She noted that L. showed "[g]reat improvements overall."  *Id.*  Ms. Savage also reported on September 17, 2018, that L. demonstrated progress "with desensitizing the emotionally charged events from the past" and that he "reported a strong desire to return to 'being normal' and being in a school program similar to his peers."  *Id.* at p. 327.  L.'s occupational therapist also reported that L. continued to improve, though she noted that he continued to have difficulty "with self-regulation, handwriting skills, [and] fine motor coordination . . . ."  *Id.* at p. 342.  The occupational therapist recommended that L.'s weekly therapy be increased in order to address L.'s remaining goals.  *Id.*

The IEP committee then met on October 2, 2018, to amend L.'s IEP to incorporate his latest progress.  This revised IEP memorializes L.'s speech and occupational therapy progress, as well as his progress in English and math.  *Id.* at p. 355.  The IEP committee also increased L.'s occupational therapy to two hours a week and removed his EMDR therapy.  *Id.* at p. 365.  The District and the parents could not initially agree to a provider that would provide L. with a comprehensive evaluation, but at a later meeting they agreed to allow Dr. Donna Van Kirk to evaluate L. (Doc. 18-1, p. 45).  Furthermore, Dr. Colvin provided the committee with feedback on L.'s trigger words, and she explained that L. continued to struggle "to persist and stay on task."  *Id.* at p. 75.

On November 16, 2018, Dr. Van Kirk evaluated L.  Dr. Van Kirk found that L.'s "performance produced a Full Scale IQ ("FSIQ") score and Indexes across the low average, borderline, and mentally deficient ranges."  *Id.* at p. 107.  His FSIQ score was 64.  *Id.*  Dr. Van Kirk also observed that L.'s "adaptive functioning is significantly below

expectation for his age and intelligence" and that his "communication, self-help, and social skills are very low and indicate a need for assistance with many activities of daily living." *Id.* at p. 111.   Dr. Van Kirk stated that the likelihood L.'s school phobia will ever be corrected "is very low" and that "his continued exposure" to school "is considered detrimental."   *Id.* at p. 112.   Thus, Dr. Van Kirk concluded that "efforts to re-integrate [L.] in his local public school be discontinued."   *Id.*

The IEP team met again in January 2019 to amend L.'s IEP.   This amended IEP included L.'s trigger words as well as updated goals and progress reports from Ms. Jaro and L.'s other providers.   Specifically, the amended IEP incorporated Ms. Jaro's report that L. can draw inferences and assess cause and effect at the third-grade level and that he performed math at the second-grade level.   *Id.*   Ms. Jaro reported that L. had difficulty stating specific characteristics of a story and that he cannot summarize a paragraph or a story.   *Id.*   She also noted that he did not understand problem-solving in math and that he had a hard time recalling information, even if it had been repeated.   *Id.*   The Richardsons expressed that they would like to know L.'s grade level skills and receive homework that L. could complete after hours, and the team agreed to perform STAR tests on L. to determine his grade level.   *Id.* at p. 179.   L. was provided STAR tests on math and reading in February 2019, and he scored a 4.4 on reading and 3.3 in math.   *Id.* at pp. 137, 145. Ms. Jaro also reported that she had increased L.'s instruction to two hours a day, and she believed she could increase that amount to four hours a day "if we were to gradually work up to that."   (Doc. 18-4, p. 215).

On March 17, 2019, the Richardsons filed a due-process complaint, alleging that the District denied L. a FAPE between March 17, 2017, and March 17, 2019 (Doc. 2-1,

pp. 1–10). Specifically, they alleged that the District failed to develop appropriate IEPs, listing a bevy of deficiencies in the IEPs. The Richardsons also alleged that the District failed to implement the IEPs because Ms. Robinson's attendance was variable and infrequent and, as a result, L. regressed. A Hearing Officer employed by the Arkansas Department of Education presided and heard testimony from witnesses, including both parents, Dr. Van Kirk, Dr. Colvin, Dr. Nichols, Gwen Benton (the District's Special Education Supervisor from 2011 until 2018), Ms. Jaro, and Missy Criner (the District's current Special Education Supervisor). Upon the agreement of the parties, the Hearing Officer also considered the deposition testimony of Ms. Robinson.

The Hearing Officer thereafter issued an 80-page decision setting forth findings of fact and conclusions of law. As is relevant here, the Hearing Officer found that L.'s IEPs satisfied the requirements of the IDEA; the goals set forth in the IEPs were appropriate; L. showed satisfactory progress; the District correctly implemented Dr. Nichols' recommendations; the District correctly denied L. extended year services for Summer 2018; the District did not fail to offer L. an education during Spring 2017; the District did not fail to educate L. in the least restrictive environment; and Infinity Academy was not the least restrictive environment and thus an inappropriate remedy (Doc. 2-3, pp. 79–80).

The Richardsons appealed the Hearing Officer's decision to this Court, which makes up Count I of their Complaint. They also brought related claims under Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act, which were subsequently bifurcated. The Richardsons filed a Motion (Doc. 19) in Support of Count I in which they seek a ruling from the Court reversing the Hearing Officer's decision. They also filed a Motion to Expand Administrative Record (Doc. 21) to include

evidence that was not before the Hearing Officer.  Having considered all of the relevant briefing, both of these motions are now ripe for consideration.

## II. DISCUSSION

### A. Motion To Expand Administrative Record

The Richardsons seek to supplement the administrative record by including the following information that was not before the Hearing Officer:  (1) the District's policies and procedures regarding the provision of and monitoring of homebound services to students, such as L.; (2) the District's policies regarding verification of reported time sheets for personnel rendering education services; (3) documentation regarding L.'s academic achievement prior to the beginning of the 2016–2017 school year; and (4) expert testimony regarding the IEPs the District prepared for L.  Although the IDEA allows a party to supplement the administrative record in the district court, 20 U.S.C. § 1415(i)(2)(C)(ii), "[r]endering a decision on the record compiled before the administrative agency . . . is the norm . . . ." *W. Platte R-II Sch. Dist. v. Wilson ex rel. L.W.*, 439 F.3d 782, 785 (8th Cir. 2006).  A party seeking to supplement the administrative record is required to demonstrate a "solid justification" to deviate from this norm.  *Indep. Sch. Dist. No. 283 v. S.D. ex rel. J.D.*, 88 F.3d 556, 560 (8th Cir. 1996) (quotation marks omitted).  "In the absence of 'solid justification' for the submission of additional evidence, the administrative hearing process would be undermined and would render meaningless Congress' admonition that the Courts ascribe 'due weight' to those underlying proceedings."  *Moubry ex rel. Moubry v. Indep. Sch. Dist. No. 696 (Ely)*, 951 F. Supp. 867, 900 (D. Minn. 1996) (quoting *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 996 (1st Cir. 1990)).

The Court finds that the Richardsons have failed to establish a solid justification to expand the record to include the District's homebound instruction policies. The Richardsons argue that the Court should consider this additional evidence because they did not anticipate that the District would present Ms. Robinson's time sheets at the due-process hearing. This argument rings hollow: The Richardsons deposed Ms. Robinson, and a colloquy between counsel during that deposition indicates that the Richardsons had Ms. Robinson's timesheets as early as January 2019, five months before the due-process hearing (Doc. 18-1, p. 236). Thus, the Richardsons had ample opportunity to review those records and muster contrary evidence for the due-process hearing. The fact that they did not do so is not a solid justification for expanding the administrative record. Furthermore, considerable testimony was elicited at the due-process hearing on the issue of Ms. Robinson's hours, so additional evidence on this point would be cumulative of an already expansive record.

The Court also finds that the Richardsons have not shown a solid justification for expanding the record to include L.'s STAR test results from before March 17, 2017. The test results in question were excluded by the Hearing Officer as being outside the IDEA's two-year statute of limitations. *See* 20 U.S.C. § 1415(f)(3)(C) (setting forth two-year statute of limitations). The Richardsons do not argue that the Hearing Officer's ruling was incorrect, but they assert that the test scores will demonstrate L.'s lack of progress. While these test results may be relevant, the administrative record already contains a voluminous amount of documentary evidence and testimony from the witnesses regarding L.'s progress during the two years at issue. Indeed, the May 2017 IEP includes a recitation of L.'s most recent STAR test results, *see* Doc. 17-3, p. 185; thus, to the extent

it is proper to consider L.'s test results from prior to March 17, 2017, the administrative record contains such information.  There is no solid justification for adding cumulative evidence into the administrative record.

Finally, the Court finds that the Richardsons have not shown a solid justification to expand the record to include expert testimony on the IEPs.  The Richardsons argue that they should be allowed to present this additional evidence because the District did not produce all documents until June 11, 2019, nine days before the deadline to exchange pre-hearing disclosures.  The Richardsons also represent that they did not present expert testimony at the due-process hearing because they presumed the Hearing Officer understood the subject matter area.  These arguments are not convincing.  The Richardsons' due-process complaint alleges that L.'s IEPs were procedurally and substantively deficient, and they presented documentary evidence and testimony in support of their attacks on the IEPs.  If the Richardsons wished to put on expert testimony at the due-process hearing, they could have done so; in fact, they did present expert witness testimony from Dr. Colvin and Dr. Van Kirk, some of which was relevant to the validity of the IEPs.  It is unclear what additional, noncumulative evidence would be presented by a new expert.  While the Richardsons are understandably dismayed at the Hearing Officer's decision, that is not a solid justification to reopen the administrative record.

### B.  The Richardsons' IDEA Appeal—Count I of the Complaint

The Court next turns to Count I of the Richardsons' Complaint:  They appeal from the Hearing Officer's Order (Doc. 2-3), which found in favor of the District with respect to their due-process complaint (Doc. 17-1, pp. 1–10).  The District's liability hinges upon a

two-part inquiry.  The Court "must first determine whether the school district followed the procedures set forth in the IDEA, and then it must decide whether the resulting IEP was 'reasonably calculated to enable the child to receive educational benefit.'"  *K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 804 (8th Cir. 2011) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206–07 (1982)).  When a school district has met these standards, it "has complied with the obligations imposed by Congress and the courts can require no more."  *Id.* (quoting *Rowley*, 458 U.S. at 207).

### 1.  Legal Standard

When reviewing state administrative decisions under the IDEA, "[t]he district court must make its decision independently, based on a preponderance of the evidence, as to whether the IDEA was violated." *Sneitzer v. Iowa Dep't of Educ.*, 796 F.3d 942, 948 (8th Cir. 2015). Thus, "the district court must 'independently determine whether the child [in question] has received a FAPE.'"  *K.E. ex rel. K.E.*, 647 F.3d at 803 (quoting *CJN v. Minneapolis Pub. Schs.*, 323 F.3d 630, 636 (8th Cir. 2003)).  The Eighth Circuit has emphasized that the court's "review is not necessarily de novo," and that a district court "should not substitute its judgment for that of the school officials."  *Sneitzer*, 796 F.3d at 948.  "Our duty is to interpret and apply the law, not to substitute our own notions of sound educational policy for those of the school authorities which we review."  *Special Sch. Dist. No. 1, Minneapolis Pub. Sch. v. R.M.M. ex rel. O.M.*, 861 F.3d 769, 771–72 (8th Cir. 2017) (cleaned up).  Here, the burden is on the Richardsons as they are challenging "the outcome of the administrative . . . decision."  *Lathrop R–II Sch. Dist. v. Gray ex rel. D.G.*,

611 F.3d 419, 423 (8th Cir. 2010); *Blackmon ex rel. Blackmon v. Springfield R–XII Sch. Dist.*, 198 F.3d 648, 658 (8th Cir. 1999).

### 2.  Procedural Violations

The Court will begin with the District's alleged violations of the IDEA's procedures. "Congress intended that IDEA's procedural safeguards be enforced so that parents of a handicapped child will have adequate input in the development of the child's IEP." *Indep. Sch. Dist. No. 283*, 88 F.3d at 562.  However, procedural violations under the IDEA do not always render an IEP invalid.  *K.E. ex rel. K.E.*, 647 F.3d at 804. "An IEP should be set aside only if procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits."  *Lathrop R–II Sch. Dist.*, 611 F.3d at 424 (quoting *Indep. Sch. Dist. No. 283*, 88 F.3d at 562); *see also* 20 U.S.C. § 1415(f)(3)(E)(ii).

While Ms. Richardson conceded at the due-process hearing that her primary concern was with the implementation of the IEPs, not the contents of the IEPs, *see* Doc. 183, p. 127, the Richardsons nonetheless identify a host of alleged procedural violations to support their claim that the District denied L. a FAPE under the IDEA.  For the reasons discussed below, the Court concludes that none of the alleged procedural shortcomings are supported by a preponderance of the evidence.

### a.  Progress Tracking and Testing

The Richardsons assert that L.'s IEPs lacked adequate data, relied on "teacher-opinionated entries" that lacked baseline data, failed to assess L.'s grade level, and were improperly copied from prior IEPs.  Further, they point out that L. did not receive STAR

testing during 2017 and 2018, nor did he receive ACT Aspire testing in Spring 2017.  They also assert that Ms. Robinson's notes regarding L.'s progress were sporadic, as well as "fabricated or otherwise based entirely on teacher opinion rather than concrete data, facts, or L.'s actual performance."  (Doc. 20, p. 50).  Further, they assert that the 2017 IEP was not updated properly.  The District disagrees, pointing out that Ms. Robinson was well aware of L.'s academic achievement and progress and noting that none of these alleged procedural deficiencies impacted L.'s education in any way.

The Court agrees with the District.  IEPs must contain "a statement of the child's present levels of educational performance," including "how the child's disability affects the child's involvement and progress in the general curriculum[,]" and "a statement of measurable annual goals, including benchmarks or short-term objectives . . . ." *Lathrop R-II Sch. Dist.*, 611 F.3d at 424 (quoting 20 U.S.C. § 1414(d)(1)(A)).  The Court has reviewed each IEP included in the record, and each IEP contains a statement of L.'s educational needs, a description of how his disability affects his progress, and a detailed list of goals and objectives for L.  *See* Docs. 17-3, pp. 183–203; 17-4, pp. 25–38; 17-5, pp. 119–127; 17-5, pp. 269–284; 17-5, pp. 351–366; 18-1, pp. 177–199.  Indeed, the IEP completed in May 2018 contains Ms. Robinson's handwritten progress notes on each of L.'s stated goals, and Ms. Jaro provided daily notes for the 2018–2019 school year.  In other words, it appears that the District did track L.'s progress throughout the two years at issue.

The parents complain that the handwritten notes in the May 2018 IEP are insufficient because they are "teacher-opinionated" and do not include "baseline data," but baseline data is not required by the IDEA.  *Lathrop R-II Sch. Dist.*, 611 F.3d at 424

(rejecting argument that baseline data is necessary to show progress in an IEP). Similarly, the parents do not point the Court to any authority explaining why Ms. Robinson's "teacher-opinionated" progress notes are insufficient under the IDEA. The Eighth Circuit has cautioned district courts not to require more from IEPs than is required by the IDEA, and the Court concludes that the goals, objectives, and progress notes set forth in L.'s IEPs do not constitute procedural violations of the IDEA.

As to the parents' argument that L.'s IEPs were improperly updated, the Court disagrees. The July 2017 IEP incorporated Dr. Nichols' recent evaluation, and it contained detailed goals and objectives for L.'s education during the upcoming year. *See* Doc. 17-4, pp. 25–38. Additionally, the administrative record shows that the IEP team met multiple times throughout the 2017–2018 school year to discuss L.'s progress under the July 2017 IEP. *See* Docs. 17-4, p. 65; 17-5, pp. 57–59. Given the voluminous evidence in the record indicating that the District and the parents worked collaboratively to update L.'s 2017 IEP (and the lack of documented complaints during those meetings), the Court declines to find that L.'s 2017 IEP was improperly drafted. Similarly, the record evidence shows that the IEP team collaborated to amend and update L.'s IEPs throughout 2018 and 2019. To the extent any of the IEPs contained typos or were similar to prior IEPs, the parents fail to point the Court to any authority showing that such issues constitute violations of the IDEA's procedural protections. Thus, a preponderance of the evidence does not support the parents' argument that L.'s IEPs were improperly updated.

As to the question of testing, the Court disagrees that the District's failure to force L. to take the ACT Aspire in Spring 2017 or STAR tests during the 2017–2018 school year constitutes a procedural violation of the IDEA. The IDEA only requires that IEPs

contain a "statement of the child's present levels of academic achievement and functional performance," 20 U.S.C. § 1414(d)(1)(A)(i)(I); the IDEA does not necessarily require standardized testing.  As already noted, the record contains evidence that Dr. Nichols performed a comprehensive evaluation of L. during July 2017 which informed the IEP team's goals and objections for L.  Additionally, the IEP team met repeatedly during the 2017–2018 school year to update the IEP based upon input from Ms. Robinson, Dr. Colvin, and L.'s speech and occupational therapy providers.  Thus, a preponderance of the evidence does not support the Richardsons' claim that the District was not tracking L.'s progress.

As to the 2017 ACT Aspire test, Ms. Richardson testified that the District forgot to provide it to L, but there is record evidence that it was not given to L. because the ADE refused to provide it in a homebound setting and the parents did not bring L. to the District campus to take the test.  The Hearing Officer was in the best position to assess the credibility of the evidence, and here it appears he discounted Ms. Richardson's testimony. Further, there is record evidence that the parents feared pushing L. too hard, and Ms. Robinson testified that she took this belief into account when deciding whether to administer STAR tests to L. during the 2017–2018 school year.  Indeed, Ms. Jaro testified that L. did not react well to the STAR tests he took in Spring 2019 (Doc. 18-4, pp. 224). In other words, the parents—not the District—are the ones who refused to provide L. with standardized testing during Spring 2017.  Based upon the Court's independent review of the administrative record and giving due weight to the Hearing Officer's decision, the Court concludes that the District's failure to test L. from Spring 2017 through Spring 2018 does not constitute a procedural violation of the IDEA.

### b. IEP Goals and Information

The Richardsons argue that L.'s IEPs were procedurally flawed because they contained "abstract benchmarks," vague adaptive behavioral goals, goals and accommodations not tailored to the homebound setting, and inconsistent statements of L.'s strengths and weaknesses (Doc. 20, pp. 49–53).  The District retorts that the IEPs are not inconsistent and that none of the alleged deficiencies had any impact on L.'s education.

The Court finds that the goal set forth in L.'s IEPs and the descriptions of L.'s strengths and weaknesses do not violate the IDEA.  The parents' complaints about "abstract benchmarks" and "vague" goals are a repeat of their arguments that the IEPs lacked "baseline data," which are not required by the IDEA.  Instead, the IDEA requires that IEPs contain "a statement of measurable annual goals . . . ."  20 U.S.C. § 1414(d)(1)(A)(i)(II).  The July 2017 IEP contained a detailed description of L.'s abilities, as evaluated by Dr. Nichols.  Doc. 17-4, p. 26.  The same IEP contains six pages of specific goals for L.'s education in the forthcoming year.  *Id.* at pp. 32–37.  The August 2018 IEP for the 2018–2019 school year is similarly detailed.  Doc. 17-5, pp. 269–279. After reviewing the entire administrative record and giving due weight to the Hearing Officer's determination, the Court concludes that this alleged procedural violation is not supported by a preponderance of the evidence.

The Court is similarly unpersuaded by the parents' arguments about inconsistencies in the IEPs.  It was not inconsistent for the IEPs to contain goals related to the classroom setting:  The explicit goal of the IEP team was to transition L. back into the classroom.  Dr. Colvin's notes and testimony demonstrate that reintegration was also

her goal.  Similarly, while the Richardsons spill considerable ink regarding the alleged inconsistencies between L.'s listed strengths and weaknesses, the Court disagrees that the parents have identified contradictions.  For example, the Richardsons complain that the August 2017 IEP lists "grammar and phonics" as one of L.'s strengths but also lists "word recognition" and "phonetics" as weaknesses (Doc. 20, p. 53).  These listed strengths and weaknesses are not contradictory.  The Richardsons' other purported inconsistencies are similarly unpersuasive.  Again, this alleged procedural violation is not supported by a preponderance of the evidence.

### c.  Amount of Instruction

The Richardsons complain that L.'s IEPs did not provide him with enough hours of instruction and assert that this failure is a procedural violation of the IDEA.  Ms. Richardson testified that she and Mr. Richardson requested that L. receive additional educational hours but that their requests went unanswered.  The District argues that this issue was not raised before the Hearing Officer and is therefore not exhausted.  Further, the District argues that it provided as many hours of instruction to L. as he could tolerate and implies that L. would have been provided with more instruction if not for the parents' actions.

To the extent the alleged lack of hours may constitute a procedural violation of the IDEA, and assuming this issue was exhausted, the Court concludes that a preponderance of the evidence does not support the Richardsons' claim.  Instead, the Court finds that the District offered L. as many educational hours as he could handle.  In the July 2017 IEP, the District offered L. five hours of homebound instruction per week, to the extent he could tolerate it (Doc. 17-4, p. 28).  In her deposition, Ms. Robinson noted that while the

Richardsons wanted L. to receive as much instruction as possible, they also did not want the District to "break him again." (Doc. 18-1, p. 232).  In contrast, Ms. Richardson testified that she and her husband pushed the District for more educational hours.  But there is little documentary support for that claim, and the Hearing Officer was able to assess the credibility of her testimony.

Indeed, the record reveals that one of the primary obstacles to educating L. is his resistance to multiple hours of education in one sitting.  In fact, after reviewing Ms. Jaro's progress notes, it is clear to the Court that it remains difficult to educate L. for multiple hours at a time, at least in the homebound setting.  To the extent L.'s tolerance for instruction increased in the 2018–2019 school year under Ms. Jaro, the Court declines to infer that he could have tolerated longer instruction in the 2017–2018 school year.  It is entirely possible, and indeed probable, that the education he received from Ms. Robinson during 2017–2018 prepared him for increased instruction during the 2018–2019 school year.  In short, the Court finds no procedural violation in the number of educational hours set forth in L.'s IEPs.[2]

### d. Trigger Words

The Richardsons argue that, between April 2017 and January 2019, none of the IEPs included L.'s "trigger words." (Doc. 20, p. 57).  They assert that this was a procedural violation of the IDEA.  The District responds that the parents refused to provide a list of trigger words, so the District was forced to come up with a list on its own (Doc. 27, p. 12).  The parents fail to point the Court to any authority explaining why the alleged failure to

---

[2]  To the extent the Richardsons argue that L. did not receive enough educational hours from Ms. Robinson, that argument is discussed *infra.*

include trigger words in L.'s IEPs violated the IDEA, and the Court has found none.  The

Court also notes that the parents have failed to explain how this alleged defect negatively

affected L.'s education.  Accordingly, the Court finds that this alleged procedural violation

is not supported by a preponderance of the evidence.

### e.  Extended Year Services

The Richardsons argue that the District procedurally violated the IDEA when it

failed to provide L. with extended year services during Summer 2018.  They point out that

Dr. Colvin recommended extended year services for that summer and that the District

refused to do so based upon invalid testing.  They also argue that the District failed to

analyze the required factors set forth in Arkansas regulations to determine whether L.

was entitled to extended year services.  In response, the District argues that the IEP team

agreed that L. was not at risk of regressing and therefore was ineligible for extended year

services.  It also argues that the regression testing given to L. was valid and that the IEP

considered all of the necessary factors when the District reached its decision that L. was

ineligible for extended year services for Summer 2018.

Arkansas regulations provide that extended year services

must be provided when it is determined by a child's IEP team that the child
has **regressed, or is predicted to regress**, to such a substantial degree in
a critical skill area that recoupment of such skill following a break in
programming . . . is unlikely or would require an unusually long period of
time.

Ark. Admin. Code 005.18.19-19.06 (emphasis added).  The regulations provide that the

following factors must be considered by an IEP team to determine a student's eligibility

for extended year services:   The degree of the child's impairment, the degree of

regression experienced by the child, recovery time from this regression, ability of the

child's parents to provide educational structure at home, the child's rate of progress, the child's behavior problems, the availability of alternative resources, the ability of the child to interact with nondisabled children, which areas in the child's curriculum require continuous attention, the child's vocational needs, and whether the requested services are "extraordinary" for the child's condition.  Ark. Admin. Code 005.18.19-19.08.

The administrative record shows that on May 22, 2018, the IEP team met to consider whether to provide extended year services to L.  (Doc. 17-5, p. 157).  The document memorializing that meeting includes each of the relevant factors with a space beside it to note whether there is a significant concern on any of the factors.  *Id.*  All of the factors are marked "No" except for the first factor.  *Id.*  This document is signed by each member of the IEP team, including the parents.  There is no indication that the parents disagreed with the IEP team's decision to deny L. extended year services for Summer 2018.  The record also contains a document showing that Ms. Robinson tested L. for regression of his math skills, and she found no regression between April 1, 2018 and April 17, 2018.  *Id.* at p. 158.  The parents argue that such testing is invalid because Ms. Robinson admitted to teaching L. between those two dates, but the District presented testimony from Ms. Benton that instruction between regression tests is appropriate so long as the instruction is not on the subject of the regression tests (Doc. 18-4, p. 104).  With this record evidence in mind and giving due weight to the Hearing Officer's decision, the Court concludes that a preponderance of the evidence does not support the Richardsons' claim that the decision to deny L. extended year services during Summer 2018 was a procedural violation of the IDEA.

### 3.  Substantive Failure to Provide a FAPE

Having found no procedural violations of the IDEA, the Court turns to the Richardsons' assertion that the District failed to meet its substantive obligation to provide L. with a FAPE.  When evaluating whether the District has met its substantive obligation under the IDEA, the Court must look at whether the District "offer[ed] an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew*, 137 S. Ct. at 999.  The educational program established by an IEP should be "appropriately ambitious in light of [the child's] circumstances" and should give the child "the chance to meet challenging objectives."  *Id.* at 1000.  The Supreme Court has cautioned that the question of whether an IEP affords a FAPE is a case-specific inquiry.  *Id.* at 1001.

### a.  Spring 2017

The Court will begin with the Richardsons' allegations regarding the 2016–2017 school year.  The Richardsons argue that:  (1) the District failed to instruct L. during April and May 2017; (2) the District provided L. with grade-inappropriate homework during April and May 2017; and (3) the District failed to conduct an ACT Aspire examination of L. during Spring 2017 (Doc. 20, pp. 10–18).  The District responds that L.'s placement was special education—not homebound instruction—during Spring 2017 and that the parents refused to bring L. to school (Doc. 27, p. 14).  The District also argues that, consistent with L.'s placement, homework was provided to L. and the failure to provide L. with the ACT Aspire examination was the fault of the parents, not the District.  *Id.* at pp. 14–15.

The parties agree that, during Spring 2017, the District did not provide homebound instruction to L. and instead only provided him with homework from his classes.  Similarly,

everyone agrees that the District failed to offer the ACT Aspire at L.'s home.  The parties do, however, disagree as to why these events occurred and whether they constitute a deprivation of a FAPE to L.  For his part, the Hearing Officer appears to have credited the testimony presented by the District:  The Hearing Officer concluded that L.'s placement during Spring 2017 was special education and that the parents refused to bring him to school (Doc. 2-3, p. 79).  The Hearing Officer also agreed that L. was properly provided with homework during Spring 2017.

After reviewing the administrative record and giving due weight to the decision of the Hearing Officer, the Court concludes that the District's actions during Spring 2017 did not violate the substantive obligations of the IDEA.  First, because *Richardson I* was still pending during Spring 2017, the "stay-put" provisions of the IDEA required that L.'s prior IEP governed his education during Spring 2017.  *See* 20 U.S.C. § 1415(j); *Pachl ex rel. Pachl v. Seagren*, 373 F. Supp. 2d 969, 976 (D. Minn. 2005) (holding that an earlier IEP controls due to stay-put provisions).  It is uncontroverted that L.'s prior IEP set his placement as special education, not homebound instruction.  While the Richardsons contend they reached an agreement with the District to change L.'s placement to homebound instruction during that period, the record does not support that contention.[3] As testified to by Ms. Benton, the homework provided to L. during Spring 2017 was the same work he would have received at school if he were in class (Doc. 18-4, p. 61).  Ms.

---

[3] The Richardsons' citations to the record on this point do not support their argument. Both of their citations point the Court to testimony of Mr. Richardson where he represents that he met with the District to discuss homebound services.  *See* Doc. 18-1, p. 321 ("We requested homebound services."); Doc. 18-3, p. 1 ("[W]e were discussing [h]omebound services to begin after the first of the year.").  The Richardsons have not directed the Court to any other evidence that the District agreed to alter L.'s placement to homebound instruction once the stay-put order became effective.

Benton did not recall any particular complaints from the parents.  *Id.* at p. 62.  Further, Ms. Benton testified that, if the parents had brought L. to school, they would have provided him the services set forth in his prior IEP.  *Id.*

As for the ACT Aspire testing, Ms. Benton testified that the District offered to make accommodations to L. so that he could take the test on campus, but the parents refused to bring him to campus to take the test.  *Id.* at pp. 100–101.  Ms. Richardson, on the other hand, testified that District officials admitted to her that they forgot to test L. during Spring 2017.  The Hearing Officer clearly credited the testimony of Ms. Benton over Ms. Richardson.  *See Bradley ex rel. Bradley v. Ark. Dept. of Educ.*, 443 F.3d 965, 974 (8th Cir. 2006) ("We recognize that hearing officers had an opportunity to observe the demeanor of the witnesses.").  The Court defers to the Hearing Officer's credibility finding; therefore, the Court finds that a preponderance of the evidence does not support the Richardsons' claim that L. was denied a FAPE in Spring 2017.

### b.  Ms. Robinson's Hours

The Richardsons argue that the District failed to provide L. a FAPE because Ms. Robinson only provided 54 hours of instruction during the 2017–2018 school year, far below the amount required by L.'s IEPs.  In support of this claim, Mr. Richardson testified that he heard Ms. Robinson admit on three occasions that she only provided 54 hours of instruction to L.  (Doc. 18-4, pp. 154–155).  When presented with timesheets indicating that Ms. Robinson provided 268 hours of services during the 2017–2018 school year, the Richardsons now assert that she must have falsified her timesheets.  Specifically, the Richardsons call her timesheets into question by making the following assertions:  (1) Ms. Robinson falsely claimed that she worked on Fridays; (2) she falsely claimed hours on

days when L. visited Dr. Colvin; (3) she falsely claimed hours on days L. was visiting Infinity; (4) she falsely claimed hours on days when she sent text messages cancelling; (5) she falsely claimed hours for days when she was out for a medical emergency; (6) she falsely claimed hours when Mr. Richardson was out of town; (7) she falsely claimed hours when L. saw Ms. Savage; and (8) she falsely claimed hours when L. was attempting to reintegrate on campus (Doc. 20, pp. 23–24).

At bottom, the issue here is:  Who is telling the truth, the Richardsons or Ms. Robinson?  The evidence that Ms. Robinson provided 268 hours of instruction is straightforward:  The District has presented her contemporaneous timesheets showing as much.  *See* Doc. 18-2, pp. 229–251.  Ms. Benton testified that the parents never complained about Ms. Robinson's attendance, Doc. 18-4, p. 106, and none of the IEP meeting notes show that the parents complained about Ms. Robinson's attendance. Moreover, Ms. Richardson admitted that she signed the IEPs and did not raise complaints about the number of hours provided by Ms. Robinson (Doc. 18-3, p. 109).  Ms. Robinson's testimony on this score is not terribly helpful, as she could not remember exactly how many hours of instruction she provided, but she did testify that she provided as many hours of instruction to L. as he could handle (Doc. 18-1, pp. 220, 230).  For example, Ms. Robinson testified that she provided "around ten hours a week if [L.] was able" during the 2017–2018 school year.  *Id.* at p. 230.

In contrast, Mr. Richardson testified that Ms. Robinson told him on three occasions that she had only provided 54 hours of instruction to L.  But one of those occasions was at an IEP meeting, and another attendee at that meeting—Ms. Benton—testified that she had no recollection of such a statement by Ms. Robinson (Doc. 18-4, p. 250).  There is

no record in the IEP notes that Ms. Robinson made such a statement or that either parent complained about her hours.  The Richardsons also point to the testimony and notes of Dr. Colvin as corroborating their allegations, but Dr. Colvin testified that all of her information came from the Richardsons (Doc. 18-3, p. 336).  Dr. Colvin's notes from April 2018 do note that the Richardsons complained that Ms. Robinson's attendance was "variable," but it is not clear if that note relates to her attendance or the Richardsons' complaint that Ms. Robinson's arrival times were inconsistent.

Turning to Mr. Richardson's testimony that Ms. Robinson falsified her timesheets, he was vigorously cross-examined on those claims.  Mr. Richardson's testimony was that Ms. Robinson only came infrequently on Fridays, but that testimony does not necessarily contradict her timesheets, which show that she sometimes did not provide instruction on Fridays.  *See* Doc. 18-2, pp. 229–244.  As for the days L. went to see Dr. Colvin, Mr. Richardson admitted under cross-examination that some of Dr. Colvin's appointments were cancelled and that it was possible Ms. Robinson provided instruction after those appointments (Doc. 18-4, pp. 188–189).  Looking at the one day when Ms. Robinson's time entry conflicted with L.'s attendance at Infinity, the District points out that it is possible Ms. Robinson provided instruction once L. returned home (Doc. 27, p. 22).

With regard to Mr. Richardson's text messages, cross-examination revealed that those records do not necessarily contradict Ms. Robinson's timesheets.  For example, one of the text messages presented by Mr. Richardson was dated "June 7," *see* Doc. 18-2, p. 291, but Ms. Robinson only claimed hours on June 7, 2018, not June 7, 2017.  On cross-examination, Mr. Richardson admitted that this text message was received on his flip phone, but denied that the message was sent in 2017 (Doc. 18-4, p. 183).  When

asked why this text message did not originate from his Samsung Galaxy—the phone he admitted to using in June 2018—Mr. Richardson admitted he could not explain the discrepancy.  *Id.* at p. 185.  Of course, this line of questioning suggests that this text message was sent in June 2017, and Mr. Richardson's evasive answers undermined his credibility.

The other text messages do not clearly demonstrate that Ms. Robinson falsified her time sheets.  Mr. Richardson presents a message from himself to Ms. Robinson at 7:26 A.M. on August 31, 2018, in which he implies that he did not expect her that day, but there is no proof in the record that she actually did not come that day (Doc. 18-2, p. 293).  Similarly, another allegedly incriminating text message is from Mr. Richardson to Ms. Robinson on September 4, 2018 (a date she recorded two hours of instruction), where he asked if she was "coming today," and she replied, "I didn't plan on it.  I thought you were going to be gone."  *Id.* at p. 295.  Again, this text message leaves open the possibility that after further communication Ms. Robinson did in fact come later that same day.  As for Ms. Robinson's text to Mr. Richardson on September 6, 2018, it is not a cancellation but instead a warning that she had limited time.  *Id.* at p. 297.  The only timesheet entries that are directly contradicted by Ms. Robinson's text messages are those on September 10, 2018 (she cancelled via text message) and September 14, 2018 (she cancelled via text message due to a migraine).  *Id.* at pp. 301–303.  These contradictions call into doubt the four hours of instruction Ms. Robinson claimed on those dates, *see* Doc. 18-2, p. 242, but it is quite a leap to imply from those two text messages that Ms. Robinson wholesale falsified her timesheets over a two-year period.

The remainder of Mr. Richardson's complaints about Ms. Robinson's hours are drawn entirely from his memory.  Mr. Richardson claims that Ms. Robinson falsified two hours in October 2017 because she had a medical emergency, *see* Doc. 18-4, p. 167, but no other evidence was presented to support that claim.  As for the hours Mr. Richardson contests because he was out of town, he does not explain why Ms. Robinson could not have provided instruction in his absence.  *Id.* at p. 159.  It is also unclear to the Court why Ms. Robinson could not have provided instruction to L. on the same days he received treatment from Ms. Savage.  Finally, while Ms. Robinson reported that she provided instruction on some of the days L. attempted to reintegrate into the school campus, it is possible she was reporting hours she worked with L. at the school, and Mr. Richardson does not explain why she should not have reported such hours.

In sum, the Hearing Officer was faced with documentary evidence that Ms. Robinson provided 268 hours of instruction, plus testimony from District officials that the parents never complained about Ms. Robinson's attendance.  Weighed against that evidence was the testimony of the Richardsons, who backed up their claims with text messages that, at best, only somewhat support their assertion that Ms. Robinson falsified her timesheets.  The Hearing Officer clearly credited the testimony of the District officials over that of the Richardsons, and the Hearing Officer was in the best position to make that credibility determination.[4]  After reviewing the entire administrative record and giving due weight to the Hearing Officer's decision, the Court concludes that a preponderance

---

[4]  The Court notes that the Richardsons agreed not to call Ms. Robinson at the due-process hearing, and they have not asked that she provide testimony as part of an expansion of the administrative record.

of the evidence does not support the Richardsons' claim that Ms. Robinson provided an insufficient number of educational hours.

### c. Adequacy of L.'s Education

The Richardsons argue that the District's education of L. was inadequate for a variety of reasons. First, they assert that the District failed to provide L. with a FAPE because the District failed to provide him with meaningful educational services during Summer 2017 and Summer 2018. They also argue that Ms. Robinson did not provide L. with a consistent educational environment; the District failed to support Ms. Jaro; and, ultimately, L. was deprived of critical learning years as evidenced by his lack of academic progress.

A preponderance of the evidence does not support these claims. First, the Richardsons' claims that the District failed to provide L. with meaningful educational services during Summer 2017 and 2018 is a rehash of their argument that Ms. Robinson falsified her timesheets. As already discussed, a preponderance of the evidence supports Ms. Robinson's timesheets, and those same timesheets indicate that L. was provided with 36 hours of compensatory education during Summer 2017 and 49.5 hours of compensatory education during Summer 2018 (Doc. 18-2, p. 251). Thus, a preponderance of evidence does not support this claim.

As for the Richardsons' arguments that the District deprived L. of a FAPE due to various deficiencies in Ms. Robinson's or Ms. Jaro's performance, the Court is unpersuaded. The essential question is whether L.'s IEPs, and the District's efforts to implement those IEPs, "were reasonably calculated" to enable L. "to make progress appropriate in light of the child's circumstances." *Endrew*, 137 S. Ct. at 999. Here, the

Richardsons argue that L. has not made appropriate progress, claiming that "his age-appropriate grade level significantly widened during the 2016–2017 and 2018–2019 school years . . . ." (Doc. 20, p. 40). Yet, upon reviewing the administrative record, it appears to the Court that L. has made some academic progress during the relevant two-year period. L.'s STAR test scores in his 2017 IEP showed a reading grade equivalency of 2.3 and math grade equivalency of 3.1 (Doc. 17-3, p. 185). L.'s STAR test in 2019 showed a score of 4.4 on reading and 3.3 in math. *Id.* at pp. 137, 145. On the face of these scores, L. has progressed approximately two grades in reading, though he has not progressed in his math skills. These scores, however, should be taken with a grain of salt; as Ms. Jaro testified, L. is extremely resistant to test taking, so the results of these tests are inherently questionable. More reliable is the testimony of Ms. Robinson and Ms. Jaro, both of whom reported that L. made academic progress (Doc. 18-1, p. 234; Doc. 18-4, p. 216). Additionally, there is considerable evidence in the record that L. made progress on his adaptive behavior and occupational therapy goals. *See* Doc. 17-5, pp. 291, 327, 341–342; Doc. 18-1, p. 129.

The Richardsons understandably argue that L.'s progress is not satisfactory. But the IDEA does not mandate that public school districts "attempt to maximize a child's potential, or guarantee that the student actually make any progress at all." *Lathrop R-II Sch. Dist.*, 611 F.3d at 424 (quoting *Minneapolis Pub. Schs.*, 323 F.3d at 642). Instead, the IDEA requires public school districts to provide a curriculum "reasonably calculated to enable a child to make progress appropriate in the light of the child's circumstances." *Endrew*, 137 S. Ct. at 999. The record establishes that L. suffers from a number of disabilities, including autism, Tourette's syndrome, ADHD, and post-traumatic stress

syndrome, all of which inhibit his academic and social development.  Further, the record suggests that the Richardsons are hesitant to reintegrate L. back into the classroom environment where he might make even greater progress due to being in a more structured environment.  In spite of these difficulties, the District has provided L. with as much instruction as he can handle in the homebound setting, and there is considerable evidence that he has indeed made significant progress on a number of fronts.  In short, a preponderance of the evidence does not support the Richardsons' claim that L. made insufficient progress in light of his circumstances.

### 4.  The Richardsons' Proposed Remedy

Even if the Richardsons were able to establish a substantive or procedural violation of the IDEA, the remedy they seek is inappropriate.  While their Complaint now seeks compensatory education in addition to private placement, the only remedy sought by the Richardsons at the due-process hearing[5]—and thus, the only exhausted remedy—was private placement of L. at Infinity.

It is true that parents have the right to place their child in a private institution and have that education paid for by a public school district.  *Evans v. Dist. No. 17 of Douglas Cnty., Neb.*, 841 F.2d 824, 832 (8th Cir. 1988).   But such reimbursement is only

---

[5]  In their Reply, the Richardsons deny that the only remedy they sought at the due-process hearing was private placement (Doc. 32, pp. 1-4).  But this assertion is belied by the following exchange during the due-process hearing:

> Hearing Officer:      And so, your remedy—the only remedy you are asking
>                                  for is for him to be placed at the Academy?
>
> Counsel:                   Yes, sir.  And for the Omaha School District to pay for
>                                  it.

(Doc. 18-2, p. 316).

appropriate when a public school fails to provide a FAPE and "the placement [is] proper under the [IDEA] and the award furthers the purposes of the Act." *C.B. ex rel. B.B. v. Special Sch. Dist. No. 1*, 636 F.3d 981, 989 (8th Cir. 2011) (cleaned up).  Further, even where private placement is allowed, responsibility for compliance with the IDEA remains with the public entity, not the private educational facility.  *See* 20 U.S.C. § 1412(a)(10)(B); Ark. Code Ann. § 6-41-206(a)(2).

The record establishes that Infinity is not accredited in Arkansas or Missouri. Instead, Infinity provides a curriculum accredited in California, and the record is silent on whether graduates of that curriculum can obtain a high school diploma in Arkansas.  The record contains little information about the type of education L. would receive at Infinity: The sample service plan prepared by Infinity is devoid of substantive content and is far less detailed than any of the IEPs prepared by the District.  The only information about Infinity's curriculum comes from Dr. Colvin, and her testimony was relatively generic, noting that Infinity has small class sizes and works with students on daily living skills (Doc. 18-3, p. 279).  Infinity also declined to implement the District's IEP, which does not give the Court confidence in its ability to provide L. with a FAPE.  Additionally, Infinity's decision not to implement the District's IEP means that placing L. at Infinity would likely force the District out of compliance with the IDEA and Arkansas regulations.

Finally, it is not clear that Infinity is the "least restrictive environment" for L.'s education.  The IDEA requires that students be educated with non-disabled students to the "maximum extent appropriate." 20 U.S.C. § 1412(a)(5).  Infinity only provides services to autistic students, and it is not clear from the record that this is the least restrictive environment for L.'s education.  There is conflicting evidence regarding L.'s abilities:  Dr.

Nichols testified that L. is relatively high functioning, while Dr. Van Kirk testified that L. should cease all attempts to reintegrate into the school environment.  Dr. Colvin's notes from Spring 2018 suggest that she believed reintegration was appropriate.  But the Richardsons only attempted to reintegrate L. to campus during a four-day period in May 2018, and it is unclear from the record why that reintegration attempt ended.  Giving due weight to the Hearing Officer's decision, the Court concludes that a preponderance of the evidence does not show that Infinity is the least restrictive environment for L.'s education.

### III. CONCLUSION

**IT IS THEREFORE ORDERED** that:

1.      The Richardsons' Motion in Support of Count I (Doc. 19) is **DENIED**;

2.      The decision of the Hearing Officer is **AFFIRMED**, and Count I of the Richardsons' Complaint is **DISMISSED WITH PREJUDICE**;

3.      The Richardsons' Motion to Expand Administrative Record (Doc. 21) is **DENIED**.

**IT IS SO ORDERED** on this 15th day of September 2020.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE